# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF WISCONSIN

CHARLES F. KRAUS,

        Plaintiff,

    v.                                      Case No. 13-C-0578

CAROLYN W. COLVIN,

        Defendant.

---

## DECISION AND ORDER

---

      This is an action for review of the final decision of the Commissioner of Social Security denying Plaintiff Charles F. Kraus's application for disability insurance benefits under Title II of the Social Security Act. Kraus challenges the decision by the Administrative Law Judge (ALJ) denying him benefits because substantial evidence does not support the ALJ's decision and the ALJ failed to follow Social Security Administration (SSA) rulings and regulations. In particular, Kraus contends that the ALJ erred by failing to conclude his cervical degenerative disc disease constituted a severe impairment, failing to give his treating physician's opinion controlling weight, and failing to incorporate all of his material limitations into the hypothetical posed to the Vocational Expert (VE) and the Residual Functional Capacity (RFC) determination. For the reasons stated in this opinion, the Commissioner's decision will be affirmed.

## BACKGROUND

      Kraus filed an application for benefits on July 23, 2009, alleging he became disabled on July 7, 2006. (Tr. 199.) He amended his onset date to January 1, 2011, at the hearing before the ALJ.

(Tr. 193–94.)   The record reveals that Kraus has a variety of health problems, including degenerative disc disease, depression, venous insufficiency, sleep apnea, and carotid artery disease. Some of these problems are long-standing.  For example, his carotid artery disease required surgery in 2005 with good results.  (Tr. 364–65, 412–13, 444, 676–88, 836–52.)  His back problems also have a significant history, with reported surgeries in 1998, 2000, and/or 2004, (Tr. 394, 425, 894), and more recent complaints of back pain with more conservative treatment starting in 2007.  (Tr. 429–30, 892–900.)  In connection with his back problems, his various doctors have ordered imaging numerous times between 2007 and 2012.  (Tr. 426–30, 503–05, 512–13, 605–07.)  The results of these tests have shown degenerative changes in his lumbar and cervical spine.  (*Id.*)  He also has a history of traumatic injuries: a closed head injury in a car accident that required hospitalization and surgery in 1994 , (Tr. 96–97, 632, 872), and a right ankle fracture that required surgery in 2008.  (Tr. 352–57, 360–63, 366–73, 376–89, 747–71.)

Many of Kraus's health problems have been excacerbated by his morbid obesity and smoking habit.  Kraus's physicians have repeatedly advised him to lose weight, alter his diet, increase physical activity, and quit smoking.  (Tr. 332–33, 348–51, 374–75, 390–93, 400–01, 404–05, 408, 584–85, 774–82, 892–95, 963–64.)  For a variety of reasons, including his asserted physical limitations and inability to maintain a diet, he has been unable to lose weight.  (Tr. 332–33, 348–51, 374–75, 400–01, 404–05, 408, 410–11, 509, 584–86, 925.)  He has, at times, temporarily quit or at least cut back on smoking, but it is unclear from the record whether he continues to smoke.  (Tr. 392, 404, 410–11, 586, 963.)  Some of his medical problems are also related to his long history of alcohol abuse.  For example, he fractured his ankle in 2008 while drunk, (Tr. 388–89,

754–55), and some of his cognitive limitations may be the result of alcohol abuse. (Tr. 632.) However, Kraus testified at the hearing that he had been sober for three years. (Tr. 61.)

While the record reflects that Kraus received more aggressive treatment at times in the past for his back pain, his physicians have pursued a conservative course of treatment for the last several years. To the extent surgery has been considered for his more recent complaints of back pain, doctors have indicated that Kraus's comorbidities counsel against surgical intervention and for allowing physical therapy a "substantial chance." (Tr. 892–900.) Consequently, his treatment for his back problems consists of medication and physical therapy from 2004 through and after his alleged onset date. (Tr. 332–41, 394–95, 704–45, 892–900.)

Unfortunately, Kraus has not always been compliant with the prescribed treatment for his ailments. Even though physical therapy improved his symptoms, Kraus failed to keep his appointments and did not continue with an independent exercise program as recommended. (Tr. 332–40, 922–23.) Of particular note for this appeal, doctors opted to treat Kraus's neck pain and radiculapathy caused by degenerative changes in his cervical spine conservatively with physical therapy with apparently good results by the end of 2009. (Tr. 590, 598–602, 897–900.) But he was discharged from physical therapy for his neck pain when he failed to return after December 2009. (Tr. 596–97.) He was again discharged from physical therapy for his lower back pain in August 2011 because he failed to attend appointments. (Tr. 967.) Similarly, his venous insufficiency causes some swelling in his lower extremities, but it is described as stable despite his repeated noncompliance with compression stockings. (Tr. 588–91, 907, 913, 925, 965.) Treatment for his mental health problems—depression and anxiety—consists entirely of medication which is

generally effective. (Tr. 474–85, 603–04, 932–45, 974–75.) There is no evidence in the record that Kraus has ever received treatment for his cognitive problems.

Of particular note for this appeal, are the reports completed by Dr. Mayank Arora, a treating physician, Dr. Syd Foster, a non-examining consulting physician, and Dr. Roger Rattan, a non-examining consulting psychologist. Dr. Arora, Kraus's most recent primary care physician, established care with Kraus in January 2011. (Tr. 930.) He saw Kraus four times after establishing care until the end of 2011 when records from his visits ends. (Tr. 925–31, 963–34.) Kraus's major complaint during these visits was lower back pain. (*Id.*) On February 14, 2011, for example, Kraus denied numbness or tingling but did complain of persistent pain that radiated into his lower extremities. (Tr. 928.) Dr. Arora identified "[n]o problems with walking or gait" during the exam. (*Id.*) There is no evidence in the record that Kraus ever complained of neck pain, upper extremity weakness or numbness, or difficulty using his hands to Dr. Arora. (*Id.*)

Dr. Arora conducted a complete physical exam of Kraus on June 21, 2011. (Tr. 925.) In his report based on this exam, Dr. Arora listed Kraus's ailments—obesity, hypertension, hyperlipidemia, coronary artery disease, sleep apnea, carotid artery occlusion, and chronic back pain—and listed his medications—Percocet, Albuterol, Alprazolam, Aspirin, Plavix, Cyclobenzaprine, EpiPen, Lasix, Metoprolol, Multivitamin, Nicotine patches, Omega Fish Oils, Potassium Chloride, and Simvastatin. (Tr. 925–26.) He also noted that Kraus had been referred to a physical therapist and a neurosurgeon for his back pain. (Tr. 927–28.) Dr. Arora described Kraus's back pain as "controlled with his pain medication, Percocet 5/325." (Tr. 925.) He did not mention any problems with Kraus's upper extremities. In fact, he concluded that Kraus had "5/5 strength in bilateral upper and lower extremities." (Tr. 926.)

Dr. Arora completed a four-page questionnaire, dated April 30, 2012, that identified Kraus's diagnosed ailments as subclavian artery stenosis, carotid arthrosclerosis, sleep apnea, hyperlipidemia, and lumbar spinal stenosis.[1]  (Tr. 976.)  The symptoms associated with these diagnoses were "back pain" with "B/L lower extremity fatigue & weakness" for which Kraus was prescribed Percocet.  (*Id.*)  Dr. Arora opined that Kraus could walk one-half of a city block without rest or severe pain, could sit for one hour before needing to get up, could sit about four hours in an eight-hour workday, could stand or walk with frequent breaks about two hours in an eight-hour workday, and would need a job that permitted shifting positions at will.  (Tr. 977.)  He also found lifting restrictions, noting that Kraus could rarely lift ten pounds and never more than that amount.  (Tr. 978.)  Dr. Arora concluded that Kraus must elevate his legs up to the level of his pelvis for approximately one-third of an eight-hour working day due to venous insufficiency.  (*Id.*)  As for reaching, handling, or fingering limitations, Dr. Arora indicated that Kraus could use his hands, fingers and arms for the following percentages of time during an eight-hour working day: (1) Grasp, turn, and twist objects with hands—greater than 66%; (2) Fine manipulation with fingers—greater than 66%; (3) Reaching in front of body with arms—between 6 and 33%; and (4) Reaching overhead with arms—between 1 and 5%.  (*Id.*)

Dr. Syd Foster, an osteopathic physician, completed a physical residual functional capacity assessment dated July 29, 2010.  (Tr. 608–15.)  According to Dr. Foster, Kraus could occasionally lift ten pounds and frequently lift less than ten pounds.  (Tr. 609.)  Kraus was also capable of standing and/or walking at least two hours and capable of sitting about six hours in an eight-hour

---

[1] The Court notes that the hand-written opinion is difficult to decipher, as is so often the case in Social Security appeals that contain medical records and opinions completed by hand.

working day. (*Id.*) Dr. Foster concluded that Kraus had no limitations in pushing or pulling. (*Id.*) He also found that there were no established postural, manipulative, visual, communicative, or environmental limitations. (Tr. 610–12.) In the additional comments, Dr. Foster noted that Kraus was diagnosed with sleep apnea, degenerative disc disease, carotid artery disease, hypertension, chronic venous insufficiency, and obesity. He also noted that Kraus suffered a left ankle fracture in 2008. (*Id.*) Most significantly, Dr. Foster specifically considered that Kraus had degenerative conditions in his lumbar and cervical spine confirmed by magnetic resonance imaging in October 2007 and August 2009 respectively. (*Id.*) He also expressly considered Kraus's reported radicular symptoms in his upper extremities and edema in his lower extremities in fashioning an RFC. (*Id.*) Even with these diagnosed medical problems and symptoms, Dr. Foster concluded that Kraus "retains the ability to perform sedentary RFC." (*Id.*)

Dr. Roger Rattan, a non-examining consulting psychologist, reviewed Kraus's medical records related to his mental disorders and completed the psychiatric review technique and a mental residual functional capacity assessment, both dated July 30, 2010. (Tr. 616–33.) In the psychiatric review technique, Dr. Rattan concluded that a residual functional capacity assessment was necessary because Kraus suffered from an organic mental disorder, an affective disorder, and a substance addiction disorder. (Tr. 616–17, 619, 624.) Based on these disorders, Dr. Rattan found the following "B" Criteria: mild restrictions of activities of daily living; mild difficulties in maintaining social functioning; moderate difficulties in maintaining concentration, persistence, or pace; and no episodes of decompensation. (Tr. 626.) After concluding that no evidence supported "C" Criteria, he went on to complete the mental residual functional capacity assessment.

6

In the mental residual functional capacity assessment, Dr. Rattan concluded that Kraus was not significantly limited in 13 of the 20 mental activities. (Tr. 630–31.) He did find that Kraus was "moderately limited" in seven activities. (*Id.*) Dr. Rattan then provided a detailed narrative functional capacity assessment. Ultimately, he concluded that even with these mental disorders, Kraus was capable of unskilled work:

> Overall findings indicate moderate limitations in CPP functioning, mild ADL and social limitations, and support clmt retaining the ability to perform the basic demands of unskilled work. Clmt's reports of limitations are found fully credible in that he does appear to have CPP limitations due to his hx of TBIs, as well as quite possibly his alcohol use, however these limitations do not limit him from being capable of all types of work.

(Tr. 632.) Dr. Rattan came to this opinion because the "[m]ajority of psych records in file do not indicate a severe mental impairment." (*Id.*) He noted Kraus's history of substance abuse and mood disorder, but that he "has done well" in attempting to remain alcohol free despite relapses. (*Id.*) Dr. Rattan also considered Kraus's IQ scores and ability to attend school "without significant difficulties" when provided some accomodations and a lighter class load based upon a recommendation from a psychological exam by the Department of Vocational Rehabilitation. (*Id.*)

SSA denied Kraus's initial application and on reconsideration. (Tr. 102, 106.) After his application was denied upon reconsideration, Kraus requested an administrative hearing. (Tr. 111–11.) A hearing was held before an ALJ on May 8, 2012. (Tr. 42.) Kraus and a VE testified at the hearing. (Tr. 42–99.)

The ALJ determined that Kraus was not disabled. (Tr. 22–33.) He found that Kraus met the insured status requirements and had not engaged in substantial gainful activity between his amended alleged onset date and his date last insured of June 30, 2011. (Tr. 24.) The ALJ found

Kraus had eight severe impairments: degenerative disc disease of the lumbar spine, chronic venous insufficiency, carotid artery disease, sleep apnea, morbid obesity, organic mental disorder, dysthymic disorder, and a history of alcohol abuse. (*Id.*)

At step three, the ALJ determined that Kraus's impairments did not meet or medically equal any listed impairments under 20 C.F.R. § 404, Subpt. P, App. 1. (Tr. 22–23) and determined Kraus's RFC as follows:

> After careful consideration of the entire record, the undersigned finds that, through the date last insured, the claimant had the residual functional capacity to perform sedentary work as defined in 20 CFR [§] 404.1567(a) in that the claimant was unable to lift and carry more than ten (10) pounds and was unable to stand and walk more than two (2) hours during an eight hour workday. In addition, the claimant had to be allowed to alternate between sitting and standing at-will; the claimant could balance, stoop, kneel, crouch, crawl, and climb ramps and stairs occasionally, but could never climb ladders, ropes, and scaffolds; the claimant had to avoid hazards; and the claimant was unable to maintain the attention or concentration necessary to perform detailed or complex tasks.

(Tr. 27.) With this RFC, the ALJ found at step four that Kraus had no past relevant work. (Tr. 32.) Finally, the ALJ found that "[c]onsidering the claimant's age, education, work experience, and residual functional capacity, there were jobs that existed in significant numbers in the national economy that the claimant could have performed." (*Id.*) These jobs included interviewing clerk, telephone quotation clerk, and packer. (Tr. 33.)

Based on these findings, the ALJ concluded that Kraus was not disabled within the meaning of the Social Security Act through June 30, 2011, the last date insured. (*Id.*) The ALJ's decision became the final decision of the Commissioner when the Appeals Council denied Kraus's request for review on April 4, 2013 (Tr. 1–3.) Kraus then commenced this action for judicial review.

**STANDARD OF REVIEW**

On judicial review, a court will uphold the Commissioner's decision if the ALJ applied the correct legal standards and supported the decision with substantial evidence. 42 U.S.C. § 405(g). "Substantial evidence is 'such relevant evidence as a reasonable mind could accept as adequate to support a conclusion.'" *Schaaf v. Astrue*, 602 F.3d 869, 874 (7th Cir. 2010) (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)). Although a decision denying benefits need not discuss every piece of evidence, remand is appropriate when an ALJ fails to provide adequate support for the conclusions drawn. *Jelinek v. Astrue*, 662 F.3d 805, 811 (7th Cir. 2011). The ALJ must provide a "logical bridge" between the evidence and conclusions. *Clifford v. Apfel*, 227 F.3d 863, 872 (7th Cir. 2000).

The ALJ is also expected to follow the SSA's rulings and regulations in making a determination. Failure to do so, unless the error is harmless, requires reversal. *Prochaska v. Barnhart*, 454 F.3d 731, 736–37 (7th Cir. 2006). In reviewing the entire record, the court does not substitute its judgment for that of the Commissioner by reconsidering facts, reweighing evidence, resolving conflicts in evidence, or deciding questions of credibility. *Estok v. Apfel*, 152 F.3d 636, 638 (7th Cir. 1998). Finally, judicial review is limited to the rationales offered by the ALJ. *Shauger v. Astrue*, 675 F.3d 690, 697 (7th Cir. 2012) (citing *SEC v. Chenery Corp.*, 318 U.S. 80, 93–95 (1943); *Campbell v. Astrue*, 627 F.3d 299, 307 (7th Cir. 2010)).

**ANALYSIS**

**I.    Step Two Analysis**

Kraus's first argument is that the ALJ erred when he determined that Kraus's degenerative disc disease in his cervical spine was not a severe impairment. Kraus contends that the ALJ's

failure to discuss this alleged impairment within his opinion was legal error. (Pl. Br. 11–12, ECF No. 11.) According to Kraus, his cervical spine impairment was well supported by the medical evidence. (*Id.*) He specifically cites to Kraus's March 2010 disability report, (Tr. 243), and medical records from 2009 as support for the impairment. (Tr. 330, 426, 590, 598, 899.) Because the ALJ did not conclude Kraus's cervical spine impairment was severe and did so without explanation, Kraus maintains that this case must be remanded because it is not possible to track the ALJ's reasoning. (Pl. Br. 12, ECF No. 11.)

The Commissioner argues, in response, that the ALJ is not required to discuss every symptom or complaint in the record. (Def. Memo. 3, ECF No. 14.) To the extent that the ALJ erred in failing to discuss Kraus's cervical spine impairment, the Commissioner contends that the error was harmless because the ALJ did find other severe impairments and proceeded through the remaining steps of the SSA evaluation process. (*Id.*) After proceeding beyond step two, the ALJ considered severe and non-severe impairments on Kraus's ability to work so the failure to identify a specific impairment as severe is not harmful error according to the Commissioner. (*Id.* at 4.) The Commissioner also argues that the ALJ correctly concluded that the cervical degenerative disc disease was not a severe impairment because the evidence in the record suggested it was a temporary impairment that ended in 2009 that did not exist after the amended alleged onset date in 2011. (*Id.* at 4–5.)

Kraus takes exception with the Commissioner's arguments, arguing that the decision is not harmless and the Commissioner violated the so-called *Chenery* rule. He contends that the determination could not be harmless because the severity determination impacted other areas of the opinion, like the RFC determination. Kraus is correct of course, that the Seventh Circuit has noted

that "no matter what happens at step two, a correct assessment remains important." *Farrell v. Astrue*, 692 F.3d 767, 772 (2012). But *Farrell* does not support the proposition that an incorrect determination at step two cannot be harmless. It is merely a reminder that even if the erroneous determination was harmless at step two, it is not necessarily the case that this erroneous determination could not be harmful at another step—for example, when crafting an RFC. *Id.* (noting that the ALJ's severity determination can only be immaterial as it "relates to meeting the required threshold in step two of the ALJ's five-step analysis"). The step two determination remains "merely a threshold requirement." *Castile v. Astrue*, 617 F.3d 923, 926–27 (7th Cir. 2010).

As for Kraus's *Chenery* arguments, even if he is correct that the Commissioner's arguments ran afoul of the Seventh Circuit's expansive interpretation of that doctrine, it does not change the outcome at step two. Rather, the merits of Kraus's invocations of *Chenery* will be discussed in connection with the ALJ's determination related to Dr. Arora's opinion. The Commissioner offered the arguments to which Kraus objects as alternatives to its main argument that the error, if any, at step two was harmless. As just discussed, whether or not the ALJ's consideration of the cervical spine disease impacted other areas of the ALJ's decision as the Seventh Circuit has warned and argued by Kraus here, it does not change the step two analysis. *See Farrell*, 692 F.3d at 772; *Castile*, 617 F.3d at 926–27. Accordingly, the ALJ's failure to identify Kraus's cervical spine disease as a severe impairment at step two is not enough to require remand because the threshold requirement was satisfied by other impairments. The ALJ's error, if any, was harmless.

## II.    Assessment of Treating Physician Opinion

Kraus next contends that the ALJ erred by failing to give controlling weight to the opinion of his treating physician, Dr. Arora. According to Kraus, the ALJ did not offer good reasons for

rejecting Dr. Arora's opinion. He argues that Dr. Arora's opinion was entitled to controlling weight because it was based upon objective findings and test results and was consistent with his treatment notes and other medical evidence of record. According to Kraus, if the ALJ had properly weighed Dr. Arora's opinion, the ALJ would have concluded that Kraus was disabled.

An ALJ must give controlling weight to treating source opinions that are "well supported by medically acceptable clinical and laboratory diagnostic techniques and are not inconsistent with other substantial evidence in the case record." 20 C.F.R. § 404.1527(c)(2); *see also Punzio v. Astrue*, 630 F.3d 704, 710 (7th Cir. 2011). "Not inconsistent" carries a specific definition according to the SSA:

> This is a term used to indicate that a well-supported treating source medical opinion need not be supported directly by all of the other evidence (i.e., it does not have to be consistent with all the other evidence) as long as there is no other substantial evidence in the case record that contradicts or conflicts with the opinion.

SSR 96-2p, 1996 WL 374188, *3 (July 2, 1996). More weight is given to the opinions of treating physicians because they have greater familiarity with the claimant's conditions and circumstances. *Clifford*, 227 F.3d at 870. If the ALJ discounts the opinion of a claimant's treating physician, the ALJ must offer "good reasons" for doing so. *Larson v. Astrue*, 615 F.3d 744, 751 (7th Cir. 2010).

The reason for giving greater weight to the opinions of treating physicians is that they "are likely to be the medical professionals most able to provide a detailed, longitudinal picture of [the claimant's] medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations." 20 C.F.R. § 404.1527(c)(2). At the same time, "a claimant is not entitled to disability benefits simply because

his physician states that he is 'disabled' or unable to work." *Dixon v. Massanari*, 270 F.3d 1171, 1177 (7th Cir. 2001). The Seventh Circuit has cautioned that treating physicians may bring their own biases to the evaluation. *See id.* ("The patient's regular physician may want to do a favor for a friend and client, and so the treating physician may too quickly find disability."). Thus, the ALJ need not blindly accept a treating physician's opinion—he may discount it if it is internally inconsistent or contradicted by other substantial medical evidence in the record. *Schmidt v. Astrue*, 496 F.3d 833, 842 (7th Cir. 2007).

Dr. Arora saw Kraus four times after establishing care until the end of 2011 when records from his visits ends. (Tr. 925–31, 963–34.) Kraus's major complaint was lower back pain during these visits. (*Id.*) For example, in his first visit, Kraus complained of a sharp pain that radiated down both legs. (Tr. 930.) But Kraus denied numbness and weakness in his legs or problems with walking or balance. (*Id.*) Dr. Arora's physical exam "revealed tenderness in the L4-L5-§ region" but sensation was intact and Kraus had a normal gait. (Tr. 931.) On February 14, Kraus again denied numbness or tingling but complained of pain that radiated into his lower extremities. (Tr. 928.) Dr. Arora identified "[n]o problems with walking or gait" during the exam. (*Id.*)

During his third visit on June 21, 2011, Dr. Arora conducted a complete physical exam of Kraus. (Tr. 925.) He listed Kraus's numerous ailments and medications and noted that Kraus had been referred to a physical therapist and a neurosurgeon for his back pain. (Tr. 925–27.) Dr. Arora described Kraus's back pain as "controlled with his pain medication, Percocet 5/325." (Tr. 925.) Even though this was a complete physical exam, he did not mention any problems with Kraus's upper extremities or cervical spine. (Tr. 925–27.) In fact, he concluded that Kraus had "5/5 strength in bilateral upper and lower extremities." (Tr. 926.)

At the final visit evidenced in the record on December 21, 2011, Dr. Arora stated the following: "For his back pain, he is on Fleberil 10mg 1 tablet twice a day. Also takes Percocet 5/325 q. 4 hours p.r.n. has not had any worsening. Underwent rehab with Jesse and seems to be doing much better. Pain is controlled with Percocet." (Tr. 963.) He also described Kraus as in "no acute distress, seated comfortably in chair." (Tr. 964.) The note further states that Kraus will continue with Percocet and Flexeril for his back pain. (*Id.*) In short, there is no indication that Kraus complained of neck pain, upper extremity weakness or numbness, or difficulty using his hands to Dr. Arora at any time. (925–31, 963–34.) There is also no complaint by Kraus of any difficulty walking or observation by Dr. Arora of an abnormal gait. (*Id.*)

Dr. Arora's four-page questionnaire, dated April 30, 2012, presents a different picture of Kraus's conditions than that described in his notes. After identifying Kraus's diagnosed ailments, Dr. Arora describes the symptoms associated with these diagnoses as "back pain" with "B/L lower extremity fatigue & weakness." (Tr. 976.) The opinion described fairly significant limitations: (1) walk one-half of a city block, (2) sit for one hour before needing to get up, (3) sit about four hours in an eight-hour workday, (4) stand or walk with frequent breaks about two hours in an eight-hour workday, (5) shift positions at will, (6) never lift more than ten pounds, and (7) elevate legs for one-third of an eight-hour workday. (Tr. 977–78.) As for reaching, handling, or fingering limitations, Dr. Arora indicated that Kraus could grasp, turn, and twist objects with his hands more than 66% of an eight-hour workday, do fine manipulation with his fingers more than 66% of an eight-hour workday, reach in front of his body with his arms between 6 and 33% of an eight-hour workday, and reach overhead with his arms between 1 and 5% of an eight-hour workday. (Tr. 978.)

In this case, the ALJ gave "some weight" to the opinion of Dr. Arora because some of his conclusions were inconsistent with the record and there was no evidence to support all of the limitations he imposed. (Tr. 32.) That is, the ALJ found Dr. Arora's opinion was not well supported by "medically acceptable clinical and laboratory diagnostic techniques" and was inconsistent with other "substantial evidence" in the record. 20 C.F.R. § 404.1527(c)(2); *Punzio*, 630 F.3d at 710. The ALJ explained that while he found the lifting restrictions reasonable, the other limitations were not:

> For example, although Dr. Arora states in his medical source statement that the claimant experiences bilateral lower extremity fatigue and weakness, Dr. Arora found 5/5 strength in the upper and lower extremities during the June 2011 examination. In addition, the relevant record contains no objective evidence of difficulty walking or standing. The record also contained no evidence of any difficulty with manipulative tasks.

(*Id.*) Kraus contends that these reasons are not good enough for the ALJ to not give Dr. Arora's opinion controlling weight.

According to Kraus, the ALJ's rejection of the upper extremity limitations is flawed because the ALJ ignored Kraus's cervical degenerative disc disease. In large part, this argument is a continuation of Kraus's challenge to the ALJ's step two determination that the cervical spine disease was not a severe impairment. He contends that the ALJ's failure to consider this diagnosed impairment at step two bled over into the ALJ's analysis of Dr. Arora's opinion. According to Kraus, if the ALJ had looked at all of the evidence in the record, he would have concluded that Dr. Arora's upper extremity limitations were well supported by the medical records from 2009 and consistent with cervical degenerative disc disease. Specifically, Kraus notes that there was an MRI

from 2009 and notes from physical therapy that confirmed this diagnosis and symptoms of pain and radiculopathy. (Tr. 426, 598–601, 605–06.)

Kraus's argument that the ALJ ignored Kraus's cervical degenerative disc disease is not persuasive. Although the ALJ did not expressly cite to the medical records and MRI from 2009 related to the cervical spine and neck pain highlighted by Kraus, the ALJ did consider the cervical degenerative disc disease when he placed "great weight" on the opinion rendered by Dr. Foster. (Tr. 31–32.) Dr. Foster specifically noted the cervical spine diagnosis and cited to the 2009 MRI in his consultative evaluation and nevertheless concluded that there were no manipulative limitations. (Tr. 609, 611, 615.) There is no question that the ALJ reliance on Dr. Foster's conclusions that Kraus had no manipulative limitations despite his diagnosed cervical disc disease was appropriate. *See* 20 C.F.R. § 404.1527(e)(2)(i) ("State agency medical and psychological consultants and other program physicians, psychologists, and other medical specialists are highly qualified physicians, psychologists, and other medical specialists who are also experts in Social Security disability evaluation."); *see also* SSR 96–6p,1996 WL 374180, *2 (July 2, 1996). This medical opinion, which considered all of the evidence supporting Kraus's cervical degenerative disc disease that exists in the record and even expressly cited the objective testing on which Kraus principally relies, directly contradicts the severe manipulative limitations Dr. Arora included.

Further, the ALJ accurately noted that there was no evidence in the record of any difficulty with manipulative tasks since the alleged onset date in 2011. Instead, the record demonstrates that these symptoms were contained within a discrete period in 2009, and even at that time the symptoms improved with physical therapy. (Tr. 596–602, 897–99.) In fact, his then-treating neurosurgeon, Dr. Richard L. Harrison, noted on December 22, 2009, that he "saw Charles Kraus

to review his progress. He did undergo physical therapy. He states his pain is substantially improved. He has no specific weakness in his upper extremities . . . . I am pleased that he is improved." (Tr. 897.) Kraus never returned to physical therapy for neck pain or upper extremity radiculopathy after December 21, 2009. (Tr. 596–97.)

If Kraus experienced a relapse in neck pain and radiculopathy, he has never complained about it to a physician. In the years following his brief treatment by Dr. Harrison and a physical therapist for neck pain, Kraus has never mentioned manipulative difficulties, tingling in his hands, or neck pain to any other physician, including Dr. Arora, his primary care physician, and Dr. Graffitt, another neurosurgeon treating Kraus for his lower back pain. (Tr. 892–96, 925–31, 963–64.) Moreover, Kraus's lack of complaints and symptoms related to the cervical spine is confirmed by Dr. Arora's medical source statement, which does not identify cervical degenerative disc disease as a diagnosis or describe neck pain and radiculopathy in the upper extremities as symptoms. (Tr. 976.) Accordingly, there is substantial evidence justifying the ALJ's conclusion.

The consideration of Dr. Foster's opinion is also fatal to Kraus's *Chenery* arguments. Kraus argues that because the ALJ's failed to provide an express discussion of Kraus's cervical disc disease or cite to the evidence that supported the diagnosis, the "only assumption" that can be made is that the ALJ failed to consider it at all. He accuses the Commissioner of advancing "post hoc arguments" that are not found in the ALJ's decision and "surmis[ing]" what the ALJ might have thought. (Pl. Reply 2, ECF No. 16.) The Commissioner has not "surmised" anything. The ALJ considered all of the evidence in the record and determined that the opinion of Dr. Foster, which looked at all of the evidence that Kraus relies on to support the manipulative limitations and cervical disc disease, was entitled to great weight.

17

Moreover, the Commissioner has not advanced any new ground or justification; she simply cited evidence from the record—like the treatment records from 2009, Dr. Arora's own medical source opinion, and the notes from Kraus's visits with Dr. Arora in 2010 and 2011—much of which the ALJ cited to in his decision. (Tr. 30–32.) To the extent that the ALJ did not explicitly cite to the same evidence in his decision, *Chenery* does not bar the Commissioner from doing so. *Chenery* holds, based on principles governing judicial review of administrative proceedings, an agency may not ask the court to uphold its action on a ground different from that on which the agency acted. 318 U.S. at 87–88, 92–93. It does not hold that the agency cannot cite evidence in the record that supports the actual findings that were made.

Here, for example, the Commissioner is not asking the court to affirm the ALJ's decision on a ground not relied upon by the ALJ. Instead, the Commissioner has cited to evidence contained in the record that further supports the specific findings that the ALJ made. The ALJ found that Dr. Arora's manipulative limitations were not supported. (Tr. 32.) The Commissioner merely points the Court to the evidentiary support for the ALJ's finding that exists. Given the fact that the central issue on judicial review of a decision of the Commissioner of Social Security is whether the Commissioner's factual findings are supported by substantial evidence, 42 U.S.C. § 405(g), this is entirely appropriate. To prohibit citation to any evidence in the record that was not expressly cited by the ALJ would reduce judicial review to a matter of cite checking the ALJ's decision. It would also confer an unfair advantage on the claimant. After all, the claimant in such cases cites to evidence not referenced by the ALJ that he thinks is contrary to the Commissioner's decision.

While the ALJ could have provided a greater discussion of his reason for discounting Dr. Arora's opinion, the ALJ is not held to the standard of articulation that Kraus would demand. The

ALJ's decision will be upheld if "substantial evidence" supports it and I am able to trace the ALJ's path of reasoning to conduct meaningful review. *Clifford*, 227 F.3d at 874. In this case, the ALJ provided ample explanation of the reasons for not affording Dr. Arora's opinion controlling weight. The ALJ found Kraus's recent treatment regimen and medical records to be inconsistent with Dr. Arora's opinion. He also concluded that the objective testing of Kraus's upper and lower extremities failed to support the extent of Kraus's incapacities described by Dr. Arora. The ALJ's expressed justifications for discounting Dr. Arora's opinion are "good reasons" to deny the treating physician's opinions controlling weight. *Larson*, 615 F.3d at 751. Because the ALJ provided "'an accurate and logical bridge' between the evidence and his conclusions," the ALJ's opinion will be upheld. *Roddy v. Astrue*, 705 F.3d 631, 636 (7th Cir. 2013) (quoting *Craft v. Astrue*, 539 F.3d 668, 673 (7th Cir. 2008); *McKinzey v. Astrue*, 641 F.3d 884, 891 (7th Cir. 2011)).

Kraus also argues that the ALJ and the Commissioner have "cherry-picked" the record and overlooked evidence that supports the walking and standing limitations imposed by Dr. Arora. Kraus is correct that there is evidence in the record that could support these limitations—his complaints of difficulty standing and walking. (Tr. 340, 337, 707, 832, 922.) Observations by physicians and physical therapists also confirm his back pain, including reduced range of motion, trouble bending, and positive straight leg raise. (Tr. 707, 588, 931.)

But it is equally correct that there is evidence in the record, including Dr. Arora's own notes, that indicates Kraus's standing and walking limitations are not as severe as Dr. Arora opined. Kraus denied numbness and weakness in his legs and reported no problems walking. (Tr. 928, 930.) Physicians, including Dr. Arora, described Kraus as having a normal gait. On March 8, 2011, Dr. Graffitt found that Kraus's "gait is steady without evidence of focal weakness." (Tr. 895.) He also

concluded that "Patrick's maneuver and straight leg raising were both negative." (*Id.*) During a May 10, 2011, exam, Dr. Griffitt found that Kraus's gait was steady, observed that Kraus had 5/5 strength in his lower extremities, and observed that Kraus had a negative straight leg raise. (Tr. 892.) Dr. Arora noted that Kraus had "[n]o problems with walking or gait" on February 14, 2011. (Tr. 928.) The back pain is also described by Dr. Arora as "controlled" with Percocet. (Tr. 925, 963.) On June 21, 2011, Dr. Arora found Kraus to have 5/5 strength in his lower extremities. (Tr.) His last note from December 2011 described Kraus's back pain as "much better" after rehab. (Tr. 963.) Finally, the ALJ also considered that Kraus has been non-complaint with the prescribed treatment and failed to attend physical therapy, (Tr. 30–31), a conclusion that is consistent with the record. (Tr. 922–23, 967.)

It is the ALJ's job to weigh competing evidence, apply the SSA's rules and regulations, and provide "'an accurate and logical bridge' between the evidence and his conclusions." *Roddy*, 705 F.3d at 636 (quoting *Craft*, 539 F.3d at 673; *McKinzey*, 641 F.3d at 891). The ALJ's decision will be upheld if "substantial evidence" supports it and I am able to trace the ALJ's path of reasoning to conduct meaningful review. *Clifford*, 227 F.3d at 874. In this case, the ALJ provided ample explanation, when looking at the opinion as a whole, for not affording Dr. Arora's opinion controlling weight. The ALJ is not guilty of cherry-picking when he elects to cite to specific examples from the record that support his decision, as he did here. To adopt the standard advanced by Kraus, the Court would impose a substantial articulation burden on every ALJ and create a de facto presumption of disability whenever a claimant can cite to some evidence in the record that

supports his asserted limitations that the ALJ did not expressly cite to in the opinion.  While the ALJ's decision could have gone into greater detail about the lack of support for or identified additional inconsistencies between the record and Dr. Arora's opinion, he was under no obligation to do so.  Because I can trace the path of the ALJ's reasoning and it is supported by substantial evidence, the ALJ's decision to not afford Dr. Arora's opinion controlling weight is not erroneous.

## III.     Limitation in Concentration, Persistence, or Pace

Kraus's final argument is that the ALJ's decision must be reversed because the ALJ's question to the vocational expert and resulting RFC determination failed to account for Kraus's limitations in concentration, persistence, or pace.  The ALJ's question to the vocational expert described the hypothetical individual as "unable to maintain the attention or concentration necessary to perform detailed or complex tasks."  (Tr. 89.)  Based on the ALJ's hypothetical, the vocational expert opined that the hypothetical person could work as an interviewing clerk, telephone quotation clerk, and packer.  (Tr. 91.)  Kraus contends that the limitations in concentration, persistence, or pace found by the ALJ and the State Agency psychologist were not incorporated into the hypothetical.  The same language was then incorporated into the RFC.  (Tr. 27.)  Before addressing the positions of the parties, it is first necessary to describe the SSA's "special technique" for evaluating mental impairments, a technique neither party explains or even cites to their briefs.

The first step of the special technique is an evaluation of the claimant's pertinent symptoms, signs, and laboratory findings to determine whether the claimant has a medically determinable mental impairment.  20 C.F.R. § 404.1520a(b)(1).  If a mental impairment is found, SSA then rates the degree of functional limitation resulting from it in four functional areas: activities of daily living;

social functioning; concentration, persistence, or pace; and episodes of decompensation. 20 C.F.R. § 404.1520a(c)(3) and (4). The "degree of limitation" in the first three areas is rated on a five-point scale: none, mild, moderate, marked and extreme. For episodes of decompensation, the degree of limitation is rated on a four-point numerical scale: none, one or two, three, four or more. These ratings are then used to determine whether the mental impairment is severe (Step 2) and, if so, whether it meets the criteria of one of the listings for mental impairments (Step 3). If a claimant has had no episodes of decompensation and the first three functional areas are rated none or mild, the agency generally concludes that the claimant does not have a severe mental impairment. 20 C.F.R. § 404.1520a(d)(1). If a claimant's impairment meets or medically equals the criteria for one of the listed impairments, the individual is deemed disabled at Step 3 of the SSA's sequential evaluation process. 20 C.F.R. § 404.1520(d)(2). If, however, a mental impairment is severe, but does not meet or medically equal a listed impairment, then a more particularized assessment is made of the claimant's mental RFC. 20 C.F.R. § 404.1520a(d)(3).

The application of the special technique is documented in a form called the Psychiatric Review Technique (PRT), which is completed by the State agency medical or psychological consultant at the initial or reconsideration level of the administrative review process. 20 C.F.R. § 404.1520a(e)(1). The ALJ is required to incorporate the pertinent findings and conclusions on the PRT into his or her written decision. 20 C.F.R. § 404.1520a(e)(4). A second form, the Mental Residual Functional Capacity Assessment (MRFCA), is used to document the more detailed evaluation that is required when the claimant's impairment, though severe, does not meet or exceed the criteria of a listing and a mental RFC must be determined. The use of these forms is explained

in the SSA's Program Operations Manual System (POMS), which is available at https://secure.ssa.gov/apps10/poms.nsf. *See* POMS, DI 24505.025 and DI 24510.060.

In this case, State Agency psychologist Roger Rattan completed the PRT and MRFCA forms.[2] (Tr. 616–33.) In July 2010, Dr. Rattan checked boxes on the PRT form indicating Kraus had organic mental, affective, and substance addiction disorders. (Tr. 616.) In rating the degree of Kraus's functional limitation on the "B" criteria of the applicable Listings, Dr. Rattan noted that he had mild limitations in activities of daily living; mild difficulties in maintaining social functioning; moderate difficulties in maintaining concentration, persistence, or pace; and no episodes of decompensation. (Tr. 626.) Dr. Rattan indicated that Kraus had a severe mental impairment but did not meet any of the Listings that applied. (Tr. 627.) He proceeded to assess Kraus's RFC using the MRFCA form dated July 20, 2010.

Section I of the MRFCA form includes a worksheet entitled "Summary Conclusions." There the form lists twenty mental health functions grouped under four categories: understanding and memory; sustained concentration and persistence; social interaction; and adaptation. To the right of each of the mental health functions is a series of checkblocks containing the following options: not significantly limited; moderately limited; markedly limited; no evidence of limitation in this category; and not ratable on available evidence. DI 24510.060. Dr. Rattan checked that Kraus was moderately limited in seven mental functions. (Tr. 630–31.) In the sustained concentration and persistence category, he marked that Kraus was moderately limited in four areas: his ability to carry

_____

[2] State agency psychologist Beth Jennings also completed the PRT in December 2009. (Tr. 553–66.) She did not, however, complete the MRFCA because she found that Kraus's mental disorders were not severe. (Tr. 565.) The ALJ gave the assessment of Dr. Jennings "little weight" because it was not consistent with the evidence. (Tr. 26.) As a result, the Court will look only at the opinion of Dr. Rattan, which the ALJ gave "great weight." (Tr. 31.)

out detailed instructions, to maintain attention and concentration for extended periods, to work in coordination with or proximity to others without being distracted by them, and to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods. (*Id.*)

Section III of the MRFCA form is entitled "Functional Capacity Assessment" and is where the actual mental RFC is recorded in narrative form. DI 24510.060. Dr. Rattan's RFC included the following:

> Majority of psych records in file do not indicate a severe mental impairment. There is sig hx of alcohol dependence, few relapses in file, but for the most part it appears clmt has done well w/ his attempt to remain alcohol free . . . . Records note clmt is attending school at this time and don't indicate him having significant difficulties with this . . . . However, the psych eval completed by DVR in 2/10 suggests there are some problems there, indicates significant accomodations being made so that clmt can attend his two classes he is taking . . . . Overall findings indicate moderate limitations in CPP functioning, mild ADL and social limitations, and support clmt retaining the ability to perform the basic demands of unskilled work. Clmt's reports of limitations are found fully credible in that he does appear to have CPP limitations due to his hx of TBIs, as well as quite possibly his alcohol use, however these limitations do not limit him from being capable of all types of work.

(Tr. 632.) Thus, it was Dr. Rattan's opinion that Kraus was capable of unskilled work, even with his moderate limitations in concentration, persistence, or pace.

The Court now turns to Kraus's argument that the limitations in concentration, persistence, or pace found by the ALJ and the State Agency psychologist were not incorporated into the hypothetical and RFC. Kraus relies on *O'Connor-Spinner v. Astrue*, 627 F.3d 614 (7th Cir. 2010), *Stewart v. Astrue*, 561 F.3d 679 (7th Cir. 2009), and *Craft v. Astrue*, 539 F.3d 668 (7th Cir. 2008), for the proposition that an ALJ may not employ phrases like "simple repetitive tasks," "simple, routine tasks," or "unskilled work" in the question to the VE or RFC finding when the ALJ or a

consulting psychologist has found moderate limitations in concentration, persistence, or pace. According to Kraus, the ALJ's phrasing that the hypothetical individual "would be unable to maintain the attention and concentration necessary to perform detailed or complex tasks" does not encapsulate his limitations in concentration, persistence, or pace.

Kraus's argument fails because he conflates the ALJ's evaluation of the severity of Kraus's limitations at steps two and three and the ALJ's formulation of the RFC for steps four and five. The ALJ explained:

> The limitations identified in the "paragraph B" criteria are not a residual functional capacity assessment but are used to rate the severity of mental impairments at steps 2 and 3 of the sequential evaluation process. The mental residual functional capacity assessment used at steps 4 and 5 of the sequential process requires a more detailed assessment by itemizing various functions contained in the broad categories found in paragraph B of the adult mental disorders listings in 12.00 of the Listing of Impairments (SSR 96-8p). Therefore, the following residual functional capacity assessment reflects the degree of limitation the undersigned has found in the "paragraph B" mental function analysis.

(Tr. 26–27.) This statement is consistent with the POMS instructions for the PRT and the SSA's special technique described in the regulations. *See* 20 C.F.R. § 404.1520a; *see also Bates v. Astrue*, No. 2:11CV361, 2012 WL 3598296, at *8 (N.D. Ind. Aug. 20, 2012) ("[T]he ALJ did find . . . that Plaintiff had moderate difficulties with regard to concentration, persistence, or pace, but that finding was made in the context of analyzing, at steps two and three, whether Plaintiff's mental condition was severe . . . and that evaluation is separate from the evaluation of RFC."). Therefore, the ALJ was justified in conducting further analysis beyond his findings at steps two and three to determine whether and how Kraus's limitations in concentration, persistence, or pace should have been incorporated into the RFC and hypothetical.

25

That the ALJ's findings with respect to the "paragraph B" criteria of a Listing are not intended as the claimant's RFC is also apparent from the significant differences between the PRT and the MRFCA forms. In the PRT form, the functional areas to be considered are described in broad and disjunctive terms. Here, for example, the State consultant checked the box indicating Kraus had a moderate degree of limitation in "maintaining concentration, persistence, or pace." (Tr. 626.) Because three different functions are listed in the disjunctive, however, a check in the moderate box does not indicate whether the limitation applies to one, two, or all three functions. The worksheet section of the MRFCA form, in contrast, breaks the three broad areas of mental function listed on the PRT into twenty functions grouped into four categories. (Tr. 630-31.) As the ALJ explained in his decision, the mental residual functional capacity assessment requires a more detailed assessment than the preliminary assessment used at steps 2 and 3 to determine whether the impairment is severe and meets a listing. (Tr. 27.)

From the foregoing, it follows that the ALJ did not err in failing to include either in his RFC or in the hypothetical question he posed to the VE a moderate limitation to maintain concentration, persistence, or pace. The SSA's rulings and regulations make clear that the preliminary findings as to the broadly defined areas of function required at Steps 2 and 3 of the sequential evaluation process are not intended as an RFC assessment. The broad categories of function considered at those steps do not lend themselves to the detailed assessment needed to determine a claimant's mental RFC so that the remaining steps in the sequential process can be completed. It is for this reason that the MRFCA is used when a severe mental impairment is shown to exist that does not meet a listing. It is not error for the ALJ to comply with the SSA's special technique for evaluating alleged mental

impairments. To the contrary, it would be error not to follow the SSA's regulations and rulings. 20 C.F.R. § 402.35(b)(1); see also *Prince v. Sullivan*, 933 F.2d 598, 602 (7th Cir.1991).

In conducting this further analysis of Kraus's limitations, the ALJ looked to the opinion of Dr. Rattan, who translated his findings into a functional RFC assessment. It is true that Dr. Rattan also checked boxes in the "Summary Conclusions" section of the MRFCA indicating Kraus had moderate limitations in several areas of function. But boxes checked in the Summary Conclusions section of the MRFCA form are not intended as mental RFC findings any more than those checked on the PRT form. The instructions for the MRFCA state that "[t]he degree and extent of the capacity or limitation must be described in narrative format in Section III." POMS, DI 24510.063. According to the POMS, "Section I [the Summary Conclusions section] is merely a worksheet to aid in deciding the presence and degree of functional limitations and the adequacy of documentation and does not constitute the RFC assessment." POMS, DI 24510.060 (emphasis in original); *see also Smith v. Comm'r of Social Sec.*, 631 F.3d 632, 637 (3d Cir.2010) ("Because Smith cannot rely on the worksheet component of the Mental Residual Functional Capacity Assessment to contend that the hypothetical question was deficient, his argument is without merit as it pertains to Dr. Tan and Dr. Graff.").

The reason the worksheet is not considered an RFC assessment becomes clear when one considers the boxes to be checked as to each function and the instructions for completing the form. Unlike the PRT form, the MRFCA form does not have a box for mild limitations. In completing the worksheet section of the form, the medical consultant is instructed to check box one indicating that the claimant is "'Not Significantly Limited,' when the effects of the mental disorder do not prevent the individual from consistently and usefully performing the activity." POMS, DI 24510.063. Box

27

two, indicating the claimant is "Moderately Limited," is to be checked "when the evidence supports the conclusion that the individual's capacity to perform the activity is impaired." *Id.* In other words, a "moderate" limitation on the MRFCA means only that there is some limitation in the claimant's capacity to consistently and usefully perform the activity, no matter how small. The evaluator is then to describe in narrative form "the degree and extent of the capacity or limitation" in Section III of the MRFCA form. POMS, DI 24510.063. That is what Dr. Rattan did here.

The Seventh Circuit has held that when a medical source of record translates his findings into a particular RFC assessment, the ALJ may reasonably rely on that assessment to formulate his RFC finding and hypothetical. *Johansen v. Barnhart,* 314 F.3d 283, 285–86 (7th Cir. 2002) (concluding that the ALJ could reasonably rely upon the opinion of "the only medical expert who made an RFC determination" that translated "findings into a specific RFC assessment"); *see also Milliken v. Astrue*, 397 F. App'x 218, 221–22 (7th Cir. 2010) (affirming ALJ's RFC finding limiting claimant to unskilled work because medical expert opined that the claimant retained ability to perform "unskilled work tasks" despite her limitations in concentration, persistence, or pace); *Wade v. Colvin*, 12 C 8260, 2014 WL 349261, at *12–13 (N.D. Ill. Jan. 31, 2014) (affirming ALJ's finding limiting claimant to simple tasks and routine, repetitive tasks when a medical expert "translated" the medical limitations into an RFC); *Baumgartner v. Colvin*, 12-C-251, 2013 WL 5874633, at *14–15 (W.D. Wis. Oct. 31, 2013) (affirming ALJ's RFC finding and hypothetical to the ALJ where the ALJ adequately accounted for the limitations the medical consultant translated into a mental RFC); *Calhoun v. Colvin*, No. 1:12-CV-00204, 2013 WL 3834750, at *10 (N.D. Ind. July 24, 2013) (affirming ALJ's RFC finding limiting claimant to "simple, repetitive tasks" because the ALJ relied "almost verbatim" on RFC translation of the State Agency psychologist). As described above, that translation is exactly what occurred in this case.

As a result, the ALJ did not make the mistake that the Seventh Circuit has criticized in *Stewart, Craft*, and *O'Connor-Spinner*. In fact, he did more than even these cases would require, as he incorporated the limitations noted by Dr. Rattan in the Summary Conclusion section of the MRFCA into the hypothetical and RFC determination. The line of cases upon which Kraus relies holds that an ALJ may not translate a claimant's moderate limitations in concentration, persistence, and pace into one or two words that do not fully account for the claimant's limitations. Here, the ALJ did not translate Kraus's mental RFC into an ability to perform unskilled work; the medical consultant made that translation. (Tr. 632.) The ALJ then relied on a psychologist who translated his findings into an RFC determination that Kraus was capable of all "the basic demands of unskilled work." (Tr. 632.) If anything, the hypothetical and RFC included a greater limitation on Kraus's ability, rather than simply restricting Kraus to unskilled work as Dr. Rattan described. Thus, the ALJ's hypothetical to the VE and the resulting RFC determination adequately accounted for Kraus's limitations related to concentration, persistence, and pace.

## CONCLUSION

Accordingly, and for the reasons set forth above, the Commissioner's decision is affirmed. The Clerk is directed to enter judgment in favor of the Commissioner forthwith.

**SO ORDERED** this __28th__ day of April, 2014.

 s/ William C. Griesbach
William C. Griesbach, Chief Judge
United States District Court